F-2006-1230

FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

APR 16 2007

MICHAEL S. RICHIE
CLERK

# IN THE COURT OF CRIMINAL APPEALS
## OF THE STATE OF OKLAHOMA

District Court of Oklahoma County Case Number
CF-2005-2777

---

## JOSHUA BRENT DAWKINS,

### APPELLANT,

RECEIVED

APR 17 2007

Attorney General

### -vs-

## THE STATE OF OKLAHOMA,

### APPELLEE.

---

## ORIGINAL BRIEF FOR AND ON BEHALF

## OF

## JOSHUA BRENT DAWKINS,

## APPELLANT.

---

**KIM CHANDLER BAZE**
O.B.A. No. 16444
Assistant Public Defender
Oklahoma County Public Defender's Office
611 County Office Building
Oklahoma City, Oklahoma 73102
(405) 713-1550

**ATTORNEY FOR APPELLANT**

BRIEF DUE
6-15-07

April 16, 2007



⑤

EXHIBIT
**3**

# TABLE OF CONTENTS

Page

STATEMENT OF THE CASE ...........................................................................1

STATEMENT OF FACTS ...............................................................................1

PROPOSITION I

    THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY
    FORCING JAMES SHELTON TO TAKE THE WITNESS STAND IN
    FRONT OF THE JURY AND REFUSE TO TESTIFY, AFTER HE
    HAD ALREADY BEEN SWORN, REFUSED, AND BEEN HELD IN
    CONTEMPT. ....................................................................................12

PROPOSITION II

    THE TRIAL COURT ERRED BY DENYING DEFENSE COUNSEL'S
    REQUEST TO INSTRUCT THE JURY ON SECOND DEGREE
    MURDER. ........................................................................................20

PROPOSITION III

    THE TRIAL COURT'S EXCLUSION OF EVIDENCE SUPPORTING
    MR DAWKIN'S DEFENSE THAT GODWIN IKUESANU WAS THE
    ACTUAL SHOOTER DEPRIVED HIM OF HIS CONSTITUTIONAL
    RIGHTS TO DUE PROCESS AND TO PRESENT A DEFENSE. ............26

PROPOSITION IV

    THE INTRODUCTION OF EVIDENCE OF OTHER CRIMES,
    WRONGS, OR BAD ACTS DEPRIVED MR. DAWKINS OF A FAIR
    TRIAL. ............................................................................................28

PROPOSITION V

    THE CUMULATIVE EFFECT OF ALL THE ERRORS DEPRIVED
    MR. DAWKINS OF A FAIR TRIAL. ...................................................41

CONCLUSION...............................................................................................42

CERTIFICATE OF SERVICE .........................................................................43

# TABLE OF AUTHORITIES

## FEDERAL CASES

Beck v. Alabama,
    447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980)........................24

Chambers v. Mississippi,
    410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973).........................27

Chapman v. California,
    386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) .............................41

Darden v. Wainwright,
    477 U.S. 168, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986).......................41

Darks v. Mullins,
    327 F.3d 1001 (10th Cir. 2003) ...........................................................41

Davis v. Zant,
    36 F.3d 1538 (11th Cir. 1994) .............................................................41

Donnelly v. DeChristoforo,
    416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974).........................41

Green v. Georgia,
    442 U.S. 95, 99 S. Ct. 2150, 60 L. Ed. 2d 738 (1979) ...........................27

Johnson v. United States,
    520 U.S. 461, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997)..........18, 19, 42

Keeble v. United States,
    412 U.S. 205, 93 S. Ct. 1993, 36 L. Ed. 2d 844 (1973)..........................23

United States v. Herndon,
    982 F.2d 1411 (10th Cir. 1992) ...........................................................36

United States v. Moore,
    375 F.3d 259 (3rd Cir. 2004) ...............................................................42

United States v. Olano,
    507 U.S. 725, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993).....................42

United States v. Rivera,
    900 F.2d 1462 (10th Cir. 1990) ...........................................................41

Washington v. Texas,
    388 U.S. 14, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967)..........................27

**STATE CASES**

Atterberry v. State,
    555 P.2d 1301 (Okl.Cr.1976) ...................................................25

Battenfield v. State,
    816 P.2d 555 (Okl.Cr.1991) ...................................................18

Bias v. United States,
    3 Ind.Terr. 27, 53 S.W. 471 (1899).........................................20

Bland v. State,
    4 P.3d 702 (Okl.Cr.2000) .................................................22, 23

Bryan v. State,
    935 P.2d 338 (Okl.Cr.1997) ..............................................39, 40

Burks v. State,
    594 P.2d 771 (Okl.Cr.1979) ...............................28, 29, 30, 31,
                                       32, 33, 35, 38,
                                          39, 40

Childress v. State,
    1 P.3d 1006 (Okl.Cr.2000) ...................................................22

Cleary v. State,
    942 P.2d 736 (Okl.Cr.1997) ..................................................42

Cobbs v. State,
    629 P.2d 368 (Okl.Cr.1981) ..................................................42

Davis v. State,
    885 P.2d 665 (Okl.Cr.1994) ..................................................38

Dixon v. State,
    545 P.2d 1262 (Okl.Cr.1976) .................................................25

Frederick v. State,
    37 P.3d 908 (Okl.Cr.2001) ...................................................23

Freeman v. State,
    876 P.2d 283 (Okla. Crim. App. 1994) ...................................22

Gilbreath v. State,
    555 P.2d 69 (Okl.Cr.1976) ............................................................23

Glossip,
    29 P.2d at 604................................................................................22

Glossip v. State,
    29 P.3d 597 (Okl.Cr.2001) ............................................................22

Gore v. State,
    119 P.3d 1268 (Okla. Crim. App. 2005) ......................................26

Hall v. State,
    528 P.2d 1117 (Okl.Cr.1974) .................................................36, 37

Hall v. State,
    615 P.2d 1020 (Okl.Cr.1980) ........................................................36

Harris v. State,
    204 P.2d 305 (1949) ......................................................................37

Hubbard v. State,
    817 P.2d 262 (Okl.Cr.1991) ..........................................................24

Id.; see also Banks v. State,
    43 P.3d 390 (Okl.Cr.2002) ............................................................19

Johnson v. State,
    905 P.2d 818 (Okl.Cr.1995) .....................................................18, 19

Kaulaity v. State,
    859 P.2d 521 (Okl.Cr.1993) .....................................................24, 25

Kinsey v. State,
    798 P.2d 630 (Okl.Cr.1990) ..........................................................22

Lott v. State,
    98 P.3d 318 (Okl.Cr.2004) .............................................28, 29, 38

Malicoat v. State,
    992 P.2d 383 (Okl.Cr.2000) ..........................................................35

Marks v. State,
    654 P.2d 652 (Okl.Cr.1982) ..........................................................35

McCarty v. State,
 765 P.2d 1215 (Okl.Cr.1988) ............................................................41

McHam v. State,
 126 P.3d 662 (Okl.Cr.2005) .............................................................22

Neill v. State,
 896 P.2d 537 (Okl.Cr.1994) .........................................................33, 34

Oglesby v. State,
 601 P.2d 458 (Okl.Cr.1979) .............................................................37

Pickens v. State,
 885 P.2d 678 (Okl.Cr.1994) .............................................................22

Reeves v. State,
 601 P.2d 113 (Okl.Cr.1979) .............................................................42

Rhine v. State,
 336 P.2d 913 (Okl.Cr.1958) .........................................................28, 29

Rogers v. State,
 890 P.2d 959 (Okl.Cr.1995) .............................................................34

Roulston v. State,
 307 P.2d 861 (Okl.Cr.1957) .............................................................35

Shrum v. State,
 991 P.2d 1032 (Okl.Cr.1999) ...........................................................22

Simpson v. State,
 876 P.2d 690 (Okl.Cr.1994) .............................................................20

Skelly v. State,
 880 P.2d 401 (Okl.Cr.1994) .............................................................41

Smallwood v. State,
 907 P.2d 217 (Okl.Cr.1995) .............................................................23

Turnbow v. State,
 451 P.2d 387 (Okl.Cr.1969) .............................................................28

Welch v. State,
 2 P.3d 356 (Okl.Cr.2000) ...........................................................29, 32

West v. State,
    764 P.2d 528 (Okl.Cr.1988) ................................................................42

Williams v. State,
    634 P.2d 1311 (Okl.Cr.1981) ..............................................................33

## CONSTITUTION

U.S. Const. Amend. VI .............................................................................26

U.S. Const. amend. XIV ...........................................................................41

Okla. Const. art. II, § 7 ...........................................................................41

## STATUTES

Okla. Stat. tit. 12, § 2104(D) .................................................................20

Okla. Stat. tit. 12, §§ 2401-03................................................................39

Okla. Stat. tit. 12, §2403 .......................................................................38

Okla. Stat. tit. 12, § 2404 ......................................................................38

Okla. Stat. tit. 12, § 2404(B) ...............................................26, 28, 36, 28, 40

Okla. Stat. tit. 21, § 701.7 ..................................................................1, 20

Okla. Stat. tit. 21, § 701.8 .....................................................................21

## MISCELLANEOUS

ABA Standards for Criminal Justice, the Prosecution Function, § 3-5.7
    (c) (1980) ...........................................................................................18

# THE COURT OF CRIMINAL APPEALS
## OF THE STATE OF OKLAHOMA

JOSHUA BRENT DAWKINS )
)
                Appellant, )      Case No. F-2006-1230
)
vs. )
)      District Ct. No. CF-05-2777
THE STATE OF OKLAHOMA, )
)
                Appellee. )

## BRIEF OF APPELLANT

## STATEMENT OF THE CASE

Appellant Joshua Brent Dawkins was charged by Information in Oklahoma County District Court, Case No. CF-2005-2777, with Murder in the First Degree, in violation of Okla. Stat. tit. 21, § 701.7. (O.R. 1-8) At jury trial held October 17-19, 2006, before the Honorable Jerry D. Bass, district judge, the jury found Appellant guilty. (O.R. 225; Tr. III, 236) The jury sentenced Appellant to life imprisonment. (O.R. 225; Tr. III, 486-487)

On November 16, 2006, the trial judge entered formal judgment and sentence in accordance with the jury's verdict. (O.R. 253-257; Sen. Tr. 8-9) The trial judge also appointed appellate counsel and approved preparation of the record, both at public expense. (Sent. Tr. 10) Mr. Dawkins has now perfected his appeal to this Court from his conviction and sentence.

## STATEMENT OF FACTS

On May 6, 2005, Marco Brooks was fatally shot at the Green Carpet Inn

in Oklahoma City. (Tr. 266-275; Tr. III, 354-355) Kendall Brooks, cousin of the decedent, testified that he met Marco that evening at the motel. (Tr. II, 215-218) Kendall was also known as "Menace." (Tr. II, 280) On this evening, Kendall agreed that quite a few people were socializing at the motel. (Tr. II, 218-219) Kendall had been drinking, and admitted he told the police he "was kind of fuzzy" that night. (Tr. II, 247)

Kendall testified that he heard an argument sometime after 12:00 a.m. (Tr. II, 220) He said that after he heard the argument, he went downstairs, and Marco was there. (Tr. II, 220-221) According to Kendall, Marco was arguing with Mr. Dawkins, and they were approximately fifteen feet apart. (Tr. II, 221-222) Kendall testified that one group of people gathered behind Marco and another group behind Mr. Dawkins. (Tr. II, 223) Kendall admitted affiliation with the Bloods gang. (Tr. II, 223-224) He testified that Crips gang members were also at the Green Carpet Inn that night, but admitted that he did not know if Mr. Dawkins had any gang affiliation. (Tr. 224-225)

The argument lasted about five minutes, according to Kendall, and the crowd got larger. (Tr. II, 226) He estimated that fifteen or twenty people gathered behind Marco and five to six people gathered behind Mr. Dawkins. (Tr. II, 226) Kendall said that he saw James Shelton come out from the room Mr. Dawkins had been in earlier that evening and try to calm things down. (Tr. II, 227-228, 230) Kendall testified that he saw Mr. Dawkins with a black automatic gun at his side, pointed towards the ground, as the argument was escalating. (Tr. II, 230-234) Kendall told police that the gun "looked like" a

2

nine millimeter, but testified that it could have been a .380. (Tr. II, 251-252)

Kendall testified that the next thing he remembers is running through the breezeway. (Tr. II, 234)  He said he ran because everybody in his group was running, but also testified that Appellant was chasing his group, with the gun at his side. (Tr. II, 235, 239, 241)  According to Kendall, he was at the end of the group and Marco was in the front. (Tr. II, 235)  He said that the group ran through the breezeway. (Tr. II, 236)  Kendall testified that he and Marco ran different directions when they approached the motel pool, and he lost sight of Marco. (Tr. II, 237)  Kendall estimated that he then heard six to eight gunshots, first from back in the breezeway, and then towards the front of the motel. (Tr. II, 237-238)

According to his testimony, Kendall heard a second group of three or four gunshots. (Tr. II, 241)  He testified that he didn't see Mr. Dawkins at this time. (Tr. II, 241)  Kendall jumped a gate near I-35, crossed the street, and stayed there for about thirty minutes. (Tr. II, 242-243)  He testified that he did not see Mr. Dawkins or Marco again that night. (Tr. II, 243)

Kendall testified that he saw someone else at the Green Carpet Inn that night with a gun. (Tr. II, 247)  He testified that "when [he] ran by the pool it sounded like a different pitch of gunfire, like maybe a smaller gun was shooting and then a larger gun." (Tr. II, 248)  Kendall admitted he never saw Mr. Dawkins shoot a gun. (Tr. II, 249)  He further admitted that he assumed Mr. Dawkins' gun was black, because it was dark outside at 1:30 a.m. (Tr. II, 249)

Oklahoma City Police Department Sergeant Jason Samuel testified that

he was sitting in his car at the stoplight at S.E. 15th Street and I-35, approximately 100 yards from the Green Carpet Inn, when he heard six or seven gunshots. (Tr. I, 17-21, 44-45) He testified that he heard a second group of two shots within fifteen to twenty seconds coming from the front of the motel. (Tr. I, 30, 44-45) Samuel testified that he could not tell if the shots came from the same gun. (Tr. I, 46)

According to Samuel, he looked towards the motel and saw three people running. (Tr. I, 20-21) Samuel testified that he stopped one person who told him someone was shooting at him, and that the gunshots he heard were coming from the front of the motel. (Tr. I, 21-23)

According to Sergeant Samuel, a yellow Oldsmobile and a purple Corsica drove around the motel, but when the drivers approached the police, they reversed, driving back around the motel, and the police followed. (Tr. I, 24-26) Samuel testified that he saw three black males run into room 137 of the motel. (Tr. I, 28-29) The sergeant testified that a woman, later identified as Tashaya Galbreath, came out of room 137 and walked toward the yellow car. (Tr. I, 29; Tr. II, 158-159, 171) According to Samuel, he told her to get away from the car and she ran back to room 137. (Tr. I, 29)

Samuel testified that several officers went to the door of room 137 and knocked, but no one would answer the door. (Tr. I, 30) The detective said he looked into the window of the room and saw men, women, and children inside. (Tr. I, 32) Samuel testified that one man, later identified as Godwin Ikuesanu, could be seen through the window washing his hands. (Tr. I, 32, 47) The

4

detective said Ikuesanu was not asked why he was washing his hands. (Tr. I, 48)

According to Samuel, several people in room 137 were kicking down the door to adjoining room 136. (Tr. I, 32, 41) The detective testified that officers entered room 136 with a key they got from the motel manager. (Tr. I, 34) Samuel testified that room 136 was empty when the officers entered, and that they then went into room 137 through the adjoining door. (Tr. I, 34-35) The police conducted a pat-down search of everyone and removed them from room 137.

Officer David Hollis testified that he took Tashaya Galbreath into custody. (Tr. I, 70-71) He obtained a consent to search room 136 and 137 from Galbreath. However, Galbreath was not staying in room 136. [Tr. II, 156]

Danny O'Dell testified that he was having coffee with coworkers at nearby Ma Kettle's restaurant on May 6, 2005, when he saw three or four people running West through the parking lot from the Green Carpet Inn. (Tr. I, 49-53) O'Dell testified that he heard three gunshots in rapid succession and opined that they came from the same gun. (Tr. I, 55-56) According to O'Dell, one of the men who had been running said "I've been hit, help me." (Tr. I, 57) O'Dell testified that he stayed with the man until the paramedics arrived. (Tr. I, 59-60) O'Dell said he did not see a gun. (Tr. I, 56)

Other residents or guests at the motel testified at trial. Sherry Young was living in Green Carpet Inn room 224 on May 6, 2005. (Tr. II, 201) She was in her room and reported hearing at least three gunshots. (Tr. II, 202)

Young testified that she opened her door and saw Appellant coming down the breezeway, running South. (Tr. II, 203-204) According to Young, she saw Appellant point a gun at a girl who was coming down the stairs. (Tr. II, 204) Young said the girl raised her arms and said "Don't shoot," and Mr. Dawkins didn't shoot at her. According to Young, Appellant fired the gun as he was running towards the back of the building. (Tr. II, 205)

Young testified that Mr. Dawkins **was not** shooting the gun at anyone, but just shooting up in the air. (Tr. II, 205-206) She said she did not know how many times he fired the gun, although she testified it was "at least three." (Tr. II, 206, 214) Young testified that she did not hear any more shots after she saw Appellant fire the gun in the breezeway. (Tr. II, 212-214)

Tashaya Galbreath testified that she was staying with her friend Danita Thomas and her two children in room 137 at the Green Carpet Inn on May 6, 2005. (Tr. II, 156-157) According to Galbreath, she was having a sexual relationship with James Shelton, and he had stayed in the room "maybe late [that] night." (Tr. II, 157-158, 195)

According to Galbreath, she heard an argument outside in the breezeway late at night on May 5, or early in the morning of May 6, 1995. (Tr. II, 158-160) Galbreath testified that when she and Thomas heard the argument, they opened the door and looked outside. (Tr. II, 160-161) Galbreath estimated that the argument was occurring about three doors down from her room and that several people were involved. (Tr. II, 161-162) According to Galbreath, Shelton was in the area of the argument. (Tr. II, 162) She testified that she

6

also recognized Mr. Dawkins in the area outside, and that Shelton was "trying to stop the argument." (Tr. II, 162) Galbreath testified that she was not sure if Mr. Dawkins was involved in the argument. (Tr. II, 163)

According to Galbreath, she shut the door after she looked out and saw the argument. (Tr. II, 164) Galbreath testified that after she shut the door, she heard more than five gunshots from the area where she had seen the argument. (Tr. II, 164-165) She testified that she looked out the door again and saw people running. (Tr. II, 165) According to Galbreath, she did not see anybody shooting. (Tr. II, 165) She said she closed her door again, and heard more gunshots "going towards the front [of the motel]." (Tr. II, 165-166)

Galbreath testified that she opened the door again and was standing in the doorway of her room when she saw a yellow car and a purple car trying to drive out. (Tr. II, 166-168) She said they "stomped on their brakes and backed up." (Tr. II, 166-168) Next, according to Galbreath, the cars backed up close to her room; four or five people jumped out, and ran into her room. (Tr. II, 168-169)

Galbreath testified that the purple car belonged to Shelton and the yellow car to Mr. Dawkins, and that they both ran into her room with the others. (Tr. II, 169-171) According to Galbreath, several people were telling her to "go park the car." (Tr. II, 171) She said she left the room, but the police told her "to step away from the car." Galbreath testified that she started towards the police, but then went back to her room. (Tr. II, 171) She testified that the police were yelling "open the door," but she sat on the bed with her children

until the police entered the room. (Tr. II, 172-173)

Galbreath testified that she gave police consent to search room 137, after they had already entered the room. (Tr. II, 174-176) In contradiction to Samuel's testimony, Galbreath testified that the adjoining door to room 137 was locked and was not opened until that day, when police kicked it in. (Tr. II, 157, 174-175)

According to Galbreath, she saw no one with a gun that night. (Tr. II, 176) She admitted she owned a .22 caliber gun and had it on May 6, 2005. (Tr. II, 176-177) In contrast, Galbreath said her gun was taken from her room and handed back to her after the shooting by a man she didn't know. (Tr. II, 178) She said she then "handed it off to someone" in her room when she went to park the car. (Tr. II, 178) Galbreath admitted that the .22 and .38 caliber ammunition in the room was hers. (Tr. II, 179-180) She testified that she had previously owned a .38, but had gotten rid of it. (Tr. II, 180)

Galbreath testified that when she was interviewed by police, they told her "the quicker [she told] them [she had] seen Mr. Dawkins with a gun, the quicker [she could] go home." (Tr. II, 183) The State asked her if she had seen Mr. Dawkins with a gun within the last few days before the shooting. (Tr. II, 188-189) Galbreath testified, over defense objection, that she had seen Mr. Dawkins a few days earlier at the Green Carpet Inn with a black pistol that could have been a nine millimeter automatic, but she could not identify the brand of the gun. (Tr. II, 189) She testified that she did not see this gun the night of the shooting. (Tr. II, 190)

8

Galbreath admitted she did not have any idea how many people were shooting that night. (Tr. II, 191) According to Galbreath, the man who brought her gun back after the shooting ran off and jumped over a fence. (Tr. II, 192) She admitted that when interviewed she told police she had gotten rid of this gun "a long time ago." (Tr. II, 193) Her testimony indicated she saw no one hide her gun that night or hold her .22 that night. (Tr. II, 193) Galbreath testified she saw a man in a black leather jacket washing his hands. (Tr. II, 194)

Ashley Byers testified that she had been staying in room 133 at the Green Carpet Inn, with her friend Dasha, for two weeks. (Tr. II, 254-256) Several people, including Marco, visited her room on May 6, 2005, according to Byers. (Tr. II, 256) She testified that she had known Marco for "probably six or seven years." (Tr. II, 256)

Byers testified that she walked from her room to a nearby Conoco to get some snacks. (Tr. II, 259-261) According to Byers, as she was walking back to the motel and entered the first building, Marco and another man were running towards her and told her to run. (Tr. II, 262) Other people "scattered," she testified. (Tr. II, 262) Byers testified that she ran up the stairs and heard gunshots in the parking lot. (Tr. II, 263-264) According to her testimony, she looked down and saw Marco and another man run under her, with Appellant following them shooting. (Tr. II, 264-265) Byers said the men were running toward Ma Kettle's restaurant. (Tr. II, 265-266) She estimated that she heard approximately ten gunshots. (Tr. II, 266) According to Byers, the shots

seemed to be coming from Appellant. (Tr. II, 266-267) She said the gun appeared to be a nine millimeter. (Tr. II, 267) Next, Byers testified that she saw Marco fall while running towards the restaurant and that she ran down the stairs to her room. (Tr. II, 267, 274-275)

According to Byers, she saw two other people with guns on the stairway down to her room. (Tr. II, 268, 277-279) She testified that she put up her hands and said "Don't shoot," and that "PK" put his gun down. (Tr. II, 268) The other man shot twice with a silver .22, according to Byers, and she ran. (Tr. II, 268-269) She testified that she heard more shots after the man fired with the .22. (Tr. II, 273) Byers said that while she was knocking on the door to her room, she saw Mr. Dawkins and "PK" try to leave in their cars, but they reversed and ran into Galbreath's room or the connecting room. (Tr. II, 270-271)

Oklahoma City Police Department Homicide Detective Roland Garrett and his partner were called to the scene when Marco's condition worsened. (Tr. II, 102-107) Marco Brooks died from a gunshot wound. (Tr. III, 354-355) Detective Garrett testified that he found four nine millimeter shells on the North side of the motel, and three nine millimeter shells on the south side of the motel near the breezeway. (Tr. II, 108-110) Detective Garrett testified that he found two guns, a .22 and a 9 millimeter in room 136. (Tr. II, 117-118, 125) DNA testing of swabs from the trigger of the gun was inconclusive. (Tr. III, 357-365)

Detective Garrett did not find a weapon in room 137. (Tr. II, 122) No 9

millimeter ammunition was found in room 136 or room 137. (Tr. II, 123) According to the detective, he found "some .22 bullets, cigarettes [and] cash," as well as some identification in a nightstand in room 137. (Tr. II, 121) He testified that he also found some .38 caliber bullets inside some luggage in room 137. (Tr. II, 122)

Garrett testified that police found a Polaroid picture of Appellant standing in front of the yellow Oldsmobile. (Tr. II, 127-128) A Polaroid camera was found in the yellow Oldsmobile; it was dusted for fingerprints, but none were found. (Tr. II, 144-146)

Sergeant Lori Crowcraft, a crime scene investigator with the Oklahoma City Police Department, assisted Sergeant Labrie in processing the crime scene at the Green Carpet Inn. (Tr. II, 292-292) She testified that she was the photographer. (Tr. II, 292) According to Crowcraft, two different brands of nine millimeter shell casings were found at the motel. (Tr. II, 299-300) Crowcraft said the police were unable to recover fingerprints from either of the two guns found. (Tr. II, 308-309) She testified that a key to room 137 was found in room 136. (Tr. II, 319)

Ron Jones, firearm and toolmark examiner for the Oklahoma City Police Department, testified that the shell casings and the bullet removed from the deceased matched the nine millimeter gun found in room 136 of the Green Carpet Inn. (Tr. III, 389-390, 394)

## PROPOSITION I

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FORCING JAMES SHELTON TO TAKE THE WITNESS STAND IN FRONT OF THE JURY AND REFUSE TO TESTIFY, AFTER HE HAD ALREADY BEEN SWORN, REFUSED, AND BEEN HELD IN CONTEMPT.**

James Shelton was called to the witness stand during the State's case-in-chief, even though he had clearly stated his intention to refuse to testify. In fact, he had been sworn in chambers, had refused to testify, had already been held in contempt, and was sentenced to six months in the county jail. He was called to the stand for the sole purpose of having him take the Fifth Amendment in front of the jury. The State asked Shelton a leading question that was highly prejudicial and, despite commentary by the trial judge, he repeatedly refused to testify. All of this happened in front of the jury.

First, the trial court held a hearing in chambers outside the presence of the jury with the defense attorney, the prosecutor, and Shelton, who was represented by counsel Larry Tedder. (Tr. II, 284-185)  The trial court appointed counsel for Shelton because he was facing contempt charges. (Tr. II, 284-285)  Shelton was serving time in prison for an unrelated crime. (Tr. II, 287)  The trial court asked Shelton "[D]o you understand that the state has subpoenaed you to testify in this case?"  Shelton said, "Yes, I do, sir." (Tr. II, 285)  The exchange continued:

> THE COURT:     And it's their intention to call you now as their next witness.  Do you understand that?
>
> MR. SHELTON:     And I'm not going to testify.
>
> THE COURT:     Answer my question.  Do you understand that

they intend to call you as their next witness?

MR. SHELTON: Yes.

THE COURT: Now, are you telling me that if they ask you a question beyond your name and begin asking you questions about this case and what you saw and didn't see and what you did and didn't do, that you're going to refuse to testify?

MR. SHELTON: Yes, sir.

THE COURT: You understand that you face contempt of – direct contempt of court?

MR. SHELTON: Yes, sir.

THE COURT: Mr. Shelton, I'm going to order you to testify in this case. Are you going to refuse to testify?

MR. SHELTON: Yes, sir.

THE COURT: Even though I have ordered you to testify?

MR. SHELTON: Yes, sir.

THE COURT: Okay. You understand that I'm going to hold you now in direct contempt?

MR. SHELTON: Yes, sir.

PROSECUTION: Your Honor, I would ask that – I believe the state has the right to actually call him. I want to call him out in open court and put him on the stand, have him ordered to testify and then have him refuse. I think I'm entitled to do that in open court.

DEFENSE: I think that overly prejudices my client, Your Honor.

PROSECUTION: I disagree.

THE COURT: Let's – before we go on. Mr. Shelton, **I'm holding you in direct contempt of court and sentence you to six months in the Oklahoma County jail.**

MR. SHELTON: Yes, sir.

THE COURT: To be served consecutive to the time you are already serving.

(Tr. II, 285-297) (Emphasis added).

The trial court advised the district attorney to call another witness, and essentially took the matter under advisement stating "Okay. I'm going to – here's what I'm going to do. Here's what I'm going to do. I'm going to leave him on the jail list. Okay. Let's go ahead and move forward and then you bring me – you all bring me your positions – your legal positions about calling him and doing that." (Tr. II, 288-289) After a recess, the trial continued with the testimony of Lori Crowcraft. (Tr. II, 290)

The day after the in camera hearing, the trial court allowed the State to call Shelton to the stand in open court. (Tr. III, 337-348) Defense counsel objected, stating "In fact, yesterday you sanctioned Mr. Shelton six months in the county jail for refusing to testify which is the maximum punishment that you could have imposed on him at that time." (Tr. III, 340) Counsel for Mr. Dawkins added, "There is no reason to do it in front of the jury except to prejudice my client. There is no reason to do it to prejudice James Shelton. There is only a reason to do it to prejudice Joshua Dawkins." (Tr. III, 340) Defense counsel continued to object, stating:

> [N]o evidence is going to come out of James Shelton. The only thing[s] that [are] going to come out of James Shelton are things that would be otherwise inadmissible because he is not going to testify.
>
> His refusal to testify is not evidence against my client. And if it's not evidence against my client it's overly prejudicial and it's not probative. And if it's not probative prejudice outweighs – it

14

does not happen in front of the jury. That is the standard for all evidence. If he's not going to testify there is nothing probative of what he is going to say.

(Tr. III, 341)

After brief discussion, Mr. Tedder said, "here's my part. You've already held him in contempt of court . . . and you held him in contempt because he testified truthfully under oath in this room yesterday that he chose not to testify." (Tr. III, 342)

> THE COURT: I suppose that, you know, it was suggested yesterday, and **I think it becomes oppressive at some point** and time to allow the state to propound question after question and have him deny or refuse to testify to each question. **I think I could probably hold him contempt of each question**.
>
> MR. TEDDER: That, your Honor – that is what led me to the situation we talked about. The expectation is he won't take the oath because I think that would possibly keep him to being subjected to further contempt punishment.
>
> THE COURT: Okay.
>
> MR. TEDDER: I think the legislature has said you refuse to testify, you get six months in jail period. That's all they provide for. If they wanted more they could have provided for more.
>
> THE COURT: And that argument is not lost on me because I have already – I mean, he refused to testify back here and now for the same act he would be punished again. **But I think that needs to be done in front of the jury**.

(Tr. III, 343)

The court then decided to allow the State to question Shelton and invited defense counsel to also question Shelton. (Tr. III, 346) Defense counsel objected to this procedure, stating, "I still think it's unbelievably prejudicial to my client. If that's going to be the ruling I will move for a mistrial at this time."

(Tr. III, 345)  Defense counsel said "You're prejudicing my client by doing this in front of the jury."  (Tr. III, 345)

The State then called Shelton to the stand in front of the jury.  (Tr. III, 348)  Defense counsel asked to approach, and formally moved for a mistrial. (Tr. II, 348-349)  The mistrial was overruled.  (Tr. II, 349)  The court then asked Shelton to be seated, stating that he had been previously sworn.  (Tr. III, 348-349)  Counsel for Shelton objected, stating that his client had only been sworn for the limited purpose of the in chambers hearing.  (Tr. II, 349)  This objection was apparently overruled, as the Judge simply said "Okay," and allowed questioning to begin.  (Tr. III, 349)

The following questioning lead to Mr. Shelton being found in contempt two additional times in front of the jury:

> PROSECUTION:  Were you present at the Green Carpet Inn on May 6th in Room number 136 when an argument ensued over a dice game between the defendant, Joshua Dawkins and the victim, Marco Brooks?
>
> MR. SHELTON:  Your Honor, I refuse to talk to this woman.  **I refuse to testify period**.  I have nothing to say to her.
>
> THE COURT:  Mr. Shelton.
>
> MR. SHELTON:  I've already been sentenced . . . .
>
> THE COURT:  Mr. Shelton.
>
> MR. SHELTON:  **Ya'll done talked to me yesterday.  Please get me out of this courtroom**.
>
> THE COURT:  Mr. Shelton, listen to me.  I'm ordering you to testify.
>
> MR. SHELTON:  I'm not going to say nothing.  You can't – I'm not saying – I don't know what you're talking about.

| THE COURT: | I am finding you in contempt. |
| MR. SHELTON: | Thank you. |
| THE COURT: | Are you going to refuse to answer? |
| MR. SHELTON: | Yes. |
| THE COURT: question? | Are you going to refuse to answer any other |
| MR. SHELTON: | Yes. |
| THE COURT: | -- put forth by the State of Oklahoma? |
| MR. SHELTON: | Yes. |

(Tr. III, 350-351)

Despite his refusal to testify, the trial court allowed defense counsel to put forth a question, and Mr. Shelton again unequivocally expressed his intention to immediately refuse to be sworn and testify. (Tr. III, 351-352) He was again held in contempt. (Tr. III, 352)

The State's question, given with the court's blessing, introduced the concept of the dice game into the juror's minds and suggested that Shelton had been present in room 136, instead of room 137. (Tr. III, 350) Further, Shelton left incriminatory inferences with the jury by his mere presence in the courtroom. These inferences were not supported by the testimony of the other witnesses and were very prejudicial to Mr. Dawkins.

Even further, in refusing to answer the State's question, Shelton gave a substantive answer: "I don't know what you're talking about." (Tr. III, 351) This answer was highly prejudicial to Mr. Dawkins because it indicated to the

jurors that Mr. Shelton was lying to protect Appellant. Finally, the trial court did not admonish the jury to disregard Shelton's statements, instead making a conscious decision to allow him to be called as a witness in front of the jury.

This Court has consistently held that it is error for the State to call a witness when the State knows the witness will invoke the Fifth Amendment right to remain silent. See Johnson v. State, 905 P.2d 818 (Okl.Cr.1995). In Johnson, the State called a co-defendant who had already been convicted and sentenced. The State knew that the witness would invoke his right to silence. The State, nevertheless, asked detailed leading questions of the witness. The Johnson Court held that the explicit leading nature of the questions combined with the witness' refusal to answer them left the unmistakable impression that the defendant knew of and was involved in the illegal transaction at issue. Johnson, 905 P.2d at 822.

The Court further held that, **"The most troubling feature of this episode is that essentially all of it occurred before the jury."** Johnson at 822. (Emphasis added). "Jury proceedings should be conducted as much as possible to facilitate making claims of privilege without the jury's knowledge. The State should not call a witness who will claim a valid privilege for the purpose of impressing the claim of privilege on the jury." Battenfield v. State, 816 P.2d 555, 560 (Okl.Cr.1991); ABA Standards for Criminal Justice, the Prosecution Function, § 3-5.7 (c) (1980).

The question related directly to the events allegedly leading up to the shooting, which was a very important issue at trial because it went to Mr.

Dawkins' malice aforethought. This sort of questioning was precisely the sort forbidden in Johnson. Johnson at 822.

Both the present case and Johnson involved the use of detailed, leading questioning. In the present case, as in Johnson, the State did not have a good faith basis for believing the witness would answer the question posed. The in camera hearing made it clear that Shelton did not intend to testify. (Tr. II, 285-297) As in Johnson, the leading nature of the question asked combined with the witness' refusal to answer it, left an unmistakable impression of Mr. Dawkins' guilt. See Id.

This Court has held that the error is reversible where the State makes a conscious and flagrant attempt to build its case from inferences arising from the witness' silence, or where the witness' refusal to answer questions adds critical weight to the State's case in a form not subject to cross-examination. See Id.; see also Banks v. State, 43 P.3d 390, 398 (Okl.Cr.2002).

In this case, both criteria are met. The State needed to introduce the concept of the dice game which allegedly led to the argument, and ultimately, the shooting. The State also attempted to place Shelton in room 136, where the gun was found, contrary to other testimony that Shelton had been in room 137. The State attempted to do this by building on Shelton's silence. Furthermore, Shelton's silence and his statement "I don't know what you are talking about" added critical weight to the State's case in a form not subject to meaningful cross-examination because of Shelton's refusal to testify.

Here, the trial court knew that Shelton would refuse to testify when

called to the stand in front of the jury. Defense counsel objected strenuously both in camera and in front of the jury. (Tr. III, 339-345; 349-350) However, this error is so fundamental that even in the absence of an objection the Court could review under its plain error doctrine. See, e.g., Okla. Stat. tit. 12, § 2104(D) (2001) ("Nothing in this section precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court."). At least part of the justification for the contemporaneous objection requirement is so that the trial court would have at least the opportunity to correct the error. Simpson v. State, 876 P.2d 690, 696 (Okl.Cr.1994) (citing Bias v. United States, 3 Ind.Terr. 27, 53 S.W. 471, 475 (1899)).

The trial court committed reversible error by allowing the State to call Shelton to the stand for the sole purpose of invoking his Fifth Amendment right not to testify. Therefore, Appellant's conviction should be reversed.

### PROPOSITION II

**THE TRIAL COURT ERRED BY DENYING DEFENSE COUNSEL'S REQUEST TO INSTRUCT THE JURY ON SECOND DEGREE MURDER.**

Mr. Dawkins was charged with Murder in the First Degree, in violation of Okla. Stat. tit. 21, § 701.7. The jury was instructed on First Degree Murder and Heat of Passion Manslaughter. (Tr. III, 404-406) Defense counsel requested a jury instruction on Second Degree Murder, but this request was denied by the trial court. (Tr. III, 405) Defense objected to the denial of a Second Degree Murder instruction in his demurrer. (Tr. III, 400)

Okla. Stat. tit. 21, § 701.8 defines homicide as Second Degree Murder "[w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to affect the death of any particular individual . . . ." Under OUJI-CR 4-91, the elements are:

First, the death of a human;

Second, caused by conduct which was imminently dangerous to other persons;

Third, the conduct was that of the defendant;

Fourth, the conduct evinced a depraved mind in extreme disregard of human life;

Fifth, the conduct is not done with the intention of taking the life of any particular individual.

The instruction continues:

You are further instructed that a person evinces a "depraved mind" when he engages in imminently dangerous conduct with contemptuous and reckless disregard of, and in total indifference to, the life and safety of another.

You are further instructed that "imminently dangerous conduct" means conduct that creates what a reasonable person would realize as an immediate and extremely high degree of risk of death to another person.

(OUJI-CR 4-91)

The facts supported such an instruction, and the trial court should have instructed the jury on Second Degree Murder. See Okla. Stat. tit. 21, § 701.8 (1991). Sheryl Young testified that Mr. Dawkins was not shooting at anyone and that he was shooting up in the air. (Tr. II, 205-206) The difference between First Degree Murder and Second Degree Murder is the degree of

intent. The evidence is admittedly contradictory concerning whether Mr. Dawkins shot towards Marco with malice aforethought or whether he shot towards a group of at least two, possibly more, people with reckless disregard for human life. (Tr. II, 235-239, Tr. II, 264-266, 273) However, the jury should have been able to decide which witness they believed.

Oklahoma law recognizes that the court is obligated to instruct on any lesser-included offenses finding support in the evidence. Bland v. State, 4 P.3d 702, 719 (Okl.Cr.2000); Shrum v. State, 991 P.2d 1032, 1034 (Okl.Cr.1999); Pickens v. State, 885 P.2d 678, 682-83 (Okl.Cr.1994), overruled on other grounds by Parker v. State, 917 P.2d 980, 986 (Okl.Cr.1996); Freeman v. State, 876 P.2d 283, 286 (Okla. Crim. App. 1994). This is true even where a defendant does not ask for the instruction. See McHam v. State, 126 P.3d 662, 669-670 (Okl.Cr.2005).

In Shrum, this Court adopted the "evidence test" and recognized "that all lesser forms of homicide **should** be administered if they are supported by the evidence." 991 P.2d at 1035 (Emphasis added). The trial court clearly has a duty to instruct on all lesser-included offenses that are supported by the evidence. Glossip v. State, 29 P.3d 597, 603-04 (Okl.Cr.2001); Childress v. State, 1 P.3d 1006, 1011 (Okl.Cr.2000); Shrum, 991 P.2d at 1036. A defendant is also entitled to an instruction on his theory of defense if it is supported by the evidence and is tenable as a matter of law. Glossip, 29 P.2d at 604; Kinsey v. State, 798 P.2d 630, 632-33 (Okl.Cr.1990).

The test used to determine whether evidence of a lesser-included offense is sufficient to warrant a jury instruction is the same test used to determine when the evidence is sufficient to warrant a jury instruction on the defendant's theory of defense. Bland, 4 P.3d at 719-20. That test is whether prima facie evidence of either the lesser-included offense or of the proposed defense has been presented to warrant the instruction. Bland at 719. If the evidence would permit the jury rationally to find the accused guilty of the lesser offense and acquit him of the greater, the trial court must give an instruction on the lesser offense. Frederick v. State, 37 P.3d 908, 943 (Okl.Cr.2001). Such instructions must be given unless the State's proof is "so conclusive as to disallow the reasonable jury from finding the existence of the lesser crime." Gilbreath v. State, 555 P.2d 69, 70 (Okl.Cr.1976).

"[T]he second degree murder statute has historically been interpreted to 'cover those situations where one commits acts imminently dangerous to others which evidenced a depraved mind, but there was no premeditated intent to kill any particular person'." See Smallwood v. State, 907 P.2d 217, 231, quoting Dennis v. State, 561 P.2d 88, 94-95 (Okl.Cr.1977). In this case, the jurors were unable to make this determination because they were improperly instructed.

The Supreme Court has noted, "Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction." Keeble v. United States, 412 U.S. 205, 212-13, 93 S.Ct. 1993, 1997-98, 36 L.Ed.2d 844 (1973).

Giving the jury an option other than acquittal or conviction of the offense charged ensures that the jury will give the defendant the full benefit of the reasonable doubt standard. Beck v. Alabama, 447 U.S. 625, 634, 100 S.Ct. 2382, 2388, 65 L.Ed.2d 392 (1980).

This Court has recognized that, "[T]he trial court should submit to the jury for consideration instructions concerning every lesser included offense, whether requested or not, where the evidence reasonably tends to support the instruction. Hubbard v. State, 817 P.2d 262, 263 (Okl.Cr.1991).

In Hubbard, the accused was tried for two counts of Shooting with Intent to Kill. The defendant was very upset because he believed someone had been tampering with his truck. He waited in the garage and when he saw a car driving down the street that he believed to be driven by the interloper, he shot, striking the paperboy in the head. Although the defendant's stated motive was to stop the harassment by shooting at whoever had been shooting at his truck, it was unclear whether his intent was to kill, to harm, or merely to frighten. Id. The Court held that issue should have been decided by the jury. Id. The Court held that where the defendant's intent is at issue, the jury should be instructed on lesser included offenses. Id.

This Court has held that it is error not to give instructions for lesser included offenses of burglary, where warranted. See Kaulaity v. State, 859 P.2d 521 (Okl.Cr.1993). In Kaulaity, the Court reversed the defendant's Second Degree Burglary conviction because the trial court did not instruct on

the lesser included offense of Illegal Entry. The Court reversed even though trial counsel did not request an instruction on Illegal Entry.

The Court's holding in <u>Kaulaity</u> is consistent with the well-established rule that instructions on lesser included offenses must be given when warranted by the evidence. <u>See</u> <u>Dixon v. State</u>, 545 P.2d 1262, 1264 (Okl.Cr.1976) (holding that trial court is required to instruct on lesser included offenses whether requested or not). In <u>Atterberry v. State</u>, 555 P.2d 1301, 1304 (Okl.Cr.1976), this Court held that where one of two inferences can be drawn from the evidence, an instruction on the lesser offense must be given, even if one inference is more probable than the other:

> While one or the other might be more probable, such probability does not raise the inference to the level of a presumption. It is not incumbent upon the defendant to introduce evidence to support a request for a lesser included offense when the State has introduced only enough evidence to raise an inference that would justify a conviction on either the offense charged or a lesser included offense.

The trial court committed reversible error by not instructing the jury as to the lesser included offense of Second Degree Murder as an alternative to finding Appellant guilty of Murder or Manslaughter. The facts in this case warranted instruction on this lesser offense. Because such an instruction was not given, Mr. Dawkins' case should be reversed.

This evidence was sufficient to raise a question for the jury whether Mr. Dawkins acted with malice aforethought. Whether Mr. Dawkins acted with a depraved mind or malice aforethought is a question of fact for the jury to make under proper instructions, including an instruction defining Second

Degree Murder. The court had a duty to instruct the jury in accordance with the uniform jury instructions on this subject. See OUJI-CR 10-23 through 10-25.

The State was certainly entitled to argue to the jury, as it did to the court, that Mr. Dawkins acted with malice aforethought, but Mr. Dawkins was entitled to argue to the jury that he acted with a depraved mind. Failure to instruct on lesser included offenses is reversible error, and Mr. Dawkins' conviction for first degree murder should be reversed.

## PROPOSITION III

### THE TRIAL COURT'S EXCLUSION OF EVIDENCE SUPPORTING MR DAWKIN'S DEFENSE THAT GODWIN IKUESANU WAS THE ACTUAL SHOOTER DEPRIVED HIM OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND TO PRESENT A DEFENSE.

During Detective Garrett's testimony, defense counsel asked the court to allow him to pose a question to Garrett concerning Ikuesanu, the man who was seen in room 137 washing his hands shortly after the shooting. (Tr. II, 152-153) The proposed question was presented in a bench conference as follows: "In your interview with Godwin Ikuenasu did he make a statement to you that indicated that his fingerprints might be found on the nine millimeter?" (Tr. II, 153) The trial court denied this request because the judge did not "think at this point and time that this defense ha[d] presented enough corroborating evidence as to the trustworthiness of the statement." (Tr. II, 153-155) The decision was based on Okla. Stat. tit. 12 § 2804 (b) (3). (Tr. II, 155) In so ruling, the court erred and deprived Mr. Dawkins of his constitutional rights to present a defense and to due process of law. See U.S. Const. Amend. VI; Gore

26

v. State, 119 P.3d 1268 (Okla. Crim. App. 2005) (exclusion of defendant's proffered third-party perpetrator evidence denied defendant due process and right to put on a defense).

The error was preserved by defense counsel's offer of proof. The State's objection was sustained, and an offer of proof was made that his answer would have been that his fingerprints might be on the nine millimeter because he moved the gun off of his jacket. (Tr. II, 155)

Even if this Court finds that the evidence was hearsay for which no exception applies, the United States Supreme Court has held that "the hearsay rule may not be applied mechanistically to defeat the ends of justice," Green v. Georgia, 442 U.S. 95, 97, 99 S.Ct. 2150, 2151-52, 60 L.Ed.2d 738 (1979); Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973), and that exclusion of highly relevant testimony, even if hearsay, can constitute a violation of the Due Process Clause of the Fourteenth Amendment. 442 U.S. at 97, 99 S.Ct. at 2151. See also Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). ("The right to offer the testimony of witnesses. . . is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.").

Mr. Dawkins had a constitutional right to present the testimony that another person told Garrett that his own fingerprints might be on the nine millimeter gun. The testimony supported his theory of defense and mitigated, if not negated, the crime for which he was charged. Accordingly, Mr. Dawkins'

conviction should be reversed, or alternatively, his sentence modified.

## PROPOSITION IV

**THE INTRODUCTION OF EVIDENCE OF OTHER CRIMES, WRONGS, OR BAD ACTS DEPRIVED MR. DAWKINS OF A FAIR TRIAL.**

The trial court committed reversible error by allowing the State to introduce irrelevant and unduly prejudicial evidence of other crimes, wrongs, or acts. This evidence of other crimes or bad acts of Appellant was admitted to show that Mr. Dawkins was a person who deserved to be punished and a violent gang member who acted in conformity with those characteristics at the time of the offense. Evidence of other crimes or bad acts is inadmissible when offered for this purpose. Okla. Stat. tit. 12, § 2404(B) (2001); see also Burks v. State, 594 P.2d 771 (Okl.Cr.1979), overruled on other grounds, Jones v. State, 772 P.2d 922 (Okl.Cr.1989).

The general rule is that when one is put on trial, one is to be convicted, if at all, by evidence which shows one guilty of the offense charged, and proof that one is guilty of other offenses not connected with that for which one is on trial must be excluded. Lott v. State, 98 P.3d 318 (Okl.Cr.2004); Burks, 594 P.2d 771. Evidence of other crimes, wrongs, or bad acts is generally irrelevant to a determination of whether the defendant committed the specific crime alleged. Turnbow v. State, 451 P.2d 387, 390 (Okl.Cr.1969); Rhine v. State, 336 P.2d 913, 920 (Okl.Cr.1958) (though such evidence may be relevant to establish "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident)." §2404(B)).

28

In <u>Burks</u>, the Court voiced increasing concern "with the number of cases in which error is committed in introducing evidence of the commission by the defendant of crimes other than the one for which the defendant is on trial." Accordingly, the Court set out a procedure to be followed where the State seeks to introduce other crimes evidence. In pertinent part, <u>Burks</u> requires: 1) pretrial notice; 2) a specification of the exception under which the evidence is sought to be admitted; 3) a visible connection between the offense charged and the offense sought to be proved; 4) a showing that the evidence is not cumulative and that it is necessary to support the State's burden of proof; 5) proof of the other crimes by clear and convincing evidence; and 6) an instruction to the jury as to the limited purpose for which the evidence is admitted. <u>Id.</u> at 774-75.

"Regardless of the exception used, there must be a visible connection between the offense charged and the offense sought to be proved." <u>Id.</u> at 774. The Court has cautioned that "[s]uch evidence should not be admitted where it is a subterfuge for showing to the jury that the defendant is a person who deserves to be punished." <u>Id.</u> at 775.

> To be admissible, evidence of other crimes must be probative of a disputed issue of the crime charged, there must be a visible connection between the crimes, evidence of the other crime(s) must be necessary to support the State's burden of proof, proof of the other crime(s) must be clear and convincing, the probative value of the evidence must outweigh the prejudice to the accused and the trial court must issue contemporaneous and final limiting instructions.

<u>Lott</u>, 98 P.3d at 334; <u>Welch v. State</u>, 2 P.3d 356, 365 (Okl.Cr.2000).

On October 7, 2004, the State filed a Notice of Intent to Use Evidence of

Other Crimes [hereinafter Burks Notice], stating their intent to introduce "evidence that [Mr. Dawkins] was a known gang member and became involved in a gang altercation while at the Green Carpet Inn," and that "the crime of gambling was unlawfully committed . . . by Joshua Dawkins who entered into a dice game for money . . . ." (O.R. 128-129) The prosecution offered a laundry list of exceptions to Burks v. State. Defense counsel filed a Motion in Limine and Objection to the State's Burks' Notice. (O.R. 143-146)

Defense counsel argued, during the pretrial hearing, that the following things should be excluded: reference to the dice game or illegal gambling, reference to the use of a weapon in commission of a felony, reference to Appellant selling marijuana at the Green Carpet Inn, and reference to or introduction of the Polaroid photograph of Appellant dressed in gang colors and making gang hand signs. (10/17/06 Tr. 6-11)

The impact of some other crimes evidence was restricted. For example, Appellant was not tried for possession of a firearm while committing a felony. (10/17/06 Tr. 4) However, the State was allowed to go into testimony concerning possession of a gun by Appellant earlier on the day of the shooting. (10/17/06 Tr. 9) Testimony about Appellant selling marijuana was limited to testimony about the use of marijuana and the State did not introduce any evidence of Appellant's violation of a specific statute addressing illegal gambling. (10/17/06 Tr. 4-8, 12)

However, many extremely prejudicial statements were made about Appellant's alleged gang involvement, as well as prejudicial exhibits introduced,

over defense objection, relating to the Appellants possession of a gun prior to the day of the shooting, dice, illegal gambling, and gang involvement. (Tr. I, 10; Tr. II, 118, 125-128, 144-146, 152, 184-189, 196, 209-212, 220, 223-226, 250, 316-318; Tr. III 460-464, 467-468, 472, 474)  For example, a Polaroid photograph of Appellant allegedly flashing a gang sign was introduced as a State's exhibit. (Tr. II, 125-127; State's Ex. 73)  The trial judge considered the Polaroid photograph relevant to dominion and control of the motel rooms. (10/17/06 Tr. 10-12)  Defense counsel objected strenuously to the introduction of the photograph as irrelevant and overly prejudicial. (Tr. II, 125-127)  The trial court considered the photograph relevant, but nonetheless recognized the prejudicial nature of the photograph by asking the prosecutor to tell Detective Garrett not to mention the gang signs. (Tr. II, 127)  Despite its prejudicial nature, the photograph was allowed to go to the jury. (Tr. II, 127-128; State's Ex. # 73)

In addition the dice found in room 136 were introduced as State's exhibit # 26. (Tr. II, 117-118)  The State attempted to tie the dice in with the guns because they were all found in room 136. (Tr. II, 125)  The Defense objected to the introduction of the dice as more prejudicial than probative, bad character evidence and irrelevant. (10/17/06 Tr. 7)  The evidence did not satisfy any Burks exception or show *res gestae*.

In its <u>Burks</u> Notice, the State listed the following <u>Burks</u> exceptions: motive, opportunity, intent, preparation, knowledge, absence of mistake or accident, identity, or common scheme or plan." (O.R. 129)  This Court has said

"we take this opportunity to remind trial judges and prosecutors of the importance of delineating the exception and purpose for which other crimes evidence is being offered. Specific rulings ensure fairness to the accused as well as facilitate expedient review of claims contesting admission of other crimes evidence." Welch v. State, 2 P.3d 356, 366 (Okl.Cr.2000).

The jury was not admonished contemporaneously or in the final jury instructions, as required by Burks. Defense counsel entered timely objections. The visible connection between the crime charged and the other crimes evidence is tenuous at best.

Counsel for Appellant argued against admission of this extremely prejudicial evidence prior to trial. (10/17/06 Tr. 6-14) Defense counsel also filed a Motion in Limine attempting to have many of the prejudicial exhibits, evidence, and prosecutorial statements excluded. (O.R. 143-146) Specifically, the defense argued that evidence or prosecutorial references that Mr. Dawkins had marijuana in his possession, had a firearm in his possession after a juvenile adjudication, was a gang member, or was involved in illegal gambling activity should be excluded. (O.R. 143)

Compounding the error in admitting these statements, the State, in closing argument, improperly relied on this extremely prejudicial evidence of other crimes or bad acts. For example, the prosecutor told the jury that "The defendant's a Crip." (Tr. III, 461) She continued:

> You've got a picture that you're welcome to take back – that you're going to see in the jury deliberation room.

And look at this picture, State's Exhibit Number 73 taken

that night of this defendant posing, doing a gang sign in front of his car in front of Room 136 and 137. And who was he with that night? . . . And who are they? Fellow gang members.

Do you think they're anything but fellow gang members? . . . Look around that room. There's blue clothing everywhere. There's a state ID card with a girl with blue hair on that.

(Tr. III, 461)

In fact, Kendall Brooks testified that he did not know if Mr. Dawkins was affiliated with any gang. (Tr. II, 224-225)

Further, these statements concerning prejudicial events, separate and distinct from the crime for which Appellant was charged, were not admissible because they did not "form part of an entire transaction" and there was not a "logical connection" with the offense charged. Neill v. State, 896 P.2d 537, 550-551 (Okl.Cr.1994) "*Res gestae*" includes events "not chargeable as separate offenses." Burks at 774. *Res gestae* has been defined as "matters incidental to the main fact and explanatory to it, including acts which are so closely connected therewith as to constitute a part of the transaction and without knowledge of which the main fact might not be properly understood." Williams v. State, 634 P.2d 1311, 1313 n.1 (Okl.Cr.1981). The jury could perfectly understand the charged crime based on witness testimony, with no mention of this extraneous prejudicial information.

The Court made the definition of *res gestae* clear when it stated that evidence qualifies as *res gestae*: "a) when it is so closely connected to the charged offense as to form part of the entire transaction, b) when it is necessary to give the jury a complete understanding of the crime, or c) when it

33

is central to the chain of events." Rogers v. State, 890 P.2d 959, 971 (Okl.Cr.1995) It is true that the "*res gestae* exception differs from the other listed exceptions to the evidence rule; in that in the listed exceptions, the other offense is intentionally proven, while in the *res gestae* exception, the other offense incidentally emerges." Neill, 896 P.2d at 550-551, quoting Dunagan v. State, 755 P.2d 102, 104 (Okl.Cr.1988). Although "[e]vidence of another crime will not be excluded where it **incidentally** emerges as events are revealed in their natural sequence," Neill at 550-551, citing Shelton v. State, 793 P.2d 866, 871 (Okl.Cr.1990) (Emphasis added), this is not the situation in Appellant's case.

The defendants in Neill used marked money obtained during a robbery to purchase cocaine and go on a spending spree, leading to their arrest. In contrast to Appellant's case, evidence of the events in Neill, which occurred during the spending spree, "were so closely related to the bank robbery and murders that they formed a logical connection with the charged offenses so as to be relevant evidence." Neill at 551. Furthermore, in Neill, unlike the case at bar, the evidence was relevant to connect the defendants with the charged crimes.

The specific question posed to Shelton, regardless of any response, suggested to the jury that Mr. Dawkins was involved in prejudicial gambling by referring to a dice game. Because testimony indicated that Shelton came out of a room which Mr. Dawkins had previously been in, by naming room 136, instead of room 137, the State attempted to forge a link between Mr. Dawkins

and the gun and dice found in room 136. This deliberate wording of the question posed to Shelton undoubtedly strengthened the State's case against Appellant.

This evidence was highly prejudicial. It is not intertwined with the evidence proving the charged offenses. This evidence was simply not *res gestae* of the crimes charged. <u>See</u> <u>Malicoat v. State</u>, 992 P.2d 383, 403 (Okl.Cr.2000).

The State may argue on appeal that the prejudicial comments and exhibits should have been admitted as part of a common scheme or plan. In <u>Marks v. State</u>, 654 P.2d 652, 654-55 (Okl.Cr.1982), the Court said that for other crimes evidence to fall within the common scheme or plan exception, there must be a visible connection between the charged crime and the other crimes evidence. The Court further held that:

> A visual connection is shown whenever there is established a common scheme or plan where the crime is committed to prepare the way for another and **the commission of the second crime is made to depend upon the perpetration of the first.**

<u>Id.</u> at 655 (Emphasis added). It is not enough merely to show a connection between the other crime and the defendant. <u>Id.</u>; <u>See also</u> <u>Roulston v. State</u>, 307 P.2d 861 (Okl.Cr.1957).

<u>Marks</u> is a textbook example of the proper application of the "common scheme or plan" exception. In that case, the charged crime was larceny of an airplane. The other-crimes evidence showed the burglary of an aviation office and the theft of keys to an airplane. <u>Marks</u>, 654 P.2d at 654. Thus, the taking of the keys prepared the way for the larceny of the aircraft. <u>See also</u> <u>Burks at</u> 1313 (trial for unauthorized use of a motor vehicle, evidence of prior burglary

35

at the home of the vehicle owner was admissible, because it showed how the defendant could have obtained the keys to the vehicle).

In <u>Hall v. State</u>, 615 P.2d 1020 (Okl.Cr.1980), the defendant was charged with rape. At trial, the State presented evidence that the defendant had committed two other rapes in the past. The State argued that the factual similarities among all the rapes showed a common scheme or plan, which rendered the other crimes evidence admissible. The Court disagreed, and held:

> **[S]imilarity between crimes, without more, is insufficient to permit admission.** ... The relationship or connection between the crimes must be such that it is possible to infer the existence, in the mind of the accused, of a plan or scheme with each crime comprising a part thereof.

<u>Hall</u>, 615 P.2d at 1022 (Citations omitted) (Emphasis added).

As <u>Hall</u> shows, factual similarity alone is not enough to render other crimes evidence admissible under the common scheme or plan exception. Even a high degree of similarity is not enough, because factual similarity is not the ultimate issue. It is a means, not an end in itself. The key to deciding whether all the crimes suggest a common scheme or plan, is whether one crime paved the way for the other. Similarity is only important if it shows a visible link from one crime to the other. Admitting other crimes evidence simply because the crimes are similar, but not visibly linked to each other, only means that the evidence is being used to show the defendant "acted in conformity therewith" – which is not a permissible reason for introducing other crimes evidence. See <u>United States v. Herndon</u>, 982 F.2d 1411, 1414 (10th Cir. 1992); Okla. Stat. tit. 12, § 2404(B) (2001).

In Oglesby v. State, 601 P.2d 458 (Okl.Cr.1979), the defendant was charged with raping his daughter in his truck while they were parked on a country road. The State was allowed to present evidence that the defendant had raped another young woman in a similar fashion about three months later. The Court reversed the conviction, finding that the other crimes evidence did not show a common scheme or plan, holding:

> [I]n this case it would be absurd to argue that the appellant committed one rape to help facilitate the commission of another rape. Nor is it plausible to say evidence of one rape should be admitted to show a propensity to rape.

Oglesby, 601 P.2d. at 459.

All of these cases show that factual similarity between crimes, by itself, only shows the defendant's propensity to commit such crimes. That is precisely why other crimes evidence should not be admitted. The Court has held that "[a]n exception to [the] rule is set out in Harris v. State, 204 P.2d 305 (1949), wherein we stated that evidence of the commission of other offenses is admissible to show common scheme, plan or unlawful intent [o]nly if such offenses are not too remote as to time and there is a visible connection between them and the offense charged. Hall v. State, 528 P.2d 1117, 1120 (Okl.Cr.1974)

The trial court allowed the State to introduce references, through prosecutorial statements and as an exhibit, to a dice game and the dice found in room 136. Further, the State introduced evidence concerning Appellant's gang membership in the form of elicited testimony about gang membership, prosecutorial comment, and the Polaroid picture which shows Appellant·

allegedly flashing a gang sign. (Tr. II, 125-127; State's Ex. 73)

A visible connection between these vague allegations of other crimes or bad acts was never demonstrated. These highly prejudicial remarks and exhibits were not in any way necessary to the State's case.

Clearly, in order to be admissible, the probative value of the proffered evidence must outweigh its danger of unfair prejudice to the defendant. See Okla. Stat. tit. 12, §2403 (2001). The Court has determined that "[w]hen other crimes evidence is so prejudicial it denies a defendant his right to be tried only for the offense charged, or where its minimal relevancy suggests the possibility the evidence is being offered to show a defendant is acting in conformity with his true character, the evidence should be suppressed." Lott at 334.

Probative value and prejudicial effect are overriding factors common to all the exceptions for admitting other crimes evidence under § 2404(B) of the Evidence Code. In essence, Okla. Stat. tit. 12, § 2404(B) (Supp. 2004) says that evidence of other crimes is not admissible to prove or disprove a fact of consequence in the case and cannot be used to show that the defendant "acted in conformity therewith" -- that is, that the defendant committed the other crime; therefore, he must have committed the presently-charged crime. See Burks at 775.

Evidence with no relevance at trial simply should not be admitted. Davis v. State, 885 P.2d 665 (Okl.Cr.1994); Okla. Stat. tit. 12, § 2404 (2001). "[O]ther crimes evidence which is admissible under a specified exception must display probative value sufficient to outweigh any prejudicial effect." Burks at

773.

Evidence offered by the State can only be admitted if it meets the criteria established by the Oklahoma Evidence Code and by the Court in <u>Burks</u>. <u>Id.</u> at 771. As with all evidence, any probative value in the other crimes evidence must be weighed against the prejudicial effect of that evidence. <u>See</u> Okla. Stat. tit. 12, §§ 2401-03 (2001).

The Court reiterated the probative value requirement in <u>Burks</u> when it wrote that before admission, the State must show: (1) that regardless of the exception used, there must be a visible connection between the charged crime and the other crimes evidence, and (2) that the other crimes evidence must be necessary to support the State's burden of proof. <u>Id.</u> at 774-75. These requirements are really restatements of the Evidence Code's general criteria that (1) all evidence must have probative value that is not outweighed by prejudicial effect, and that (2) evidence not be needlessly cumulative. <u>See</u> Okla. Stat. tit. 12, §§ 2401-03 (2001).

The Court has stated that "[t]he reason other crimes evidence is so limited and its admission guarded revolves around fairness to the accused who should be convicted, if at all, by evidence of the charged offense and not by evidence of separate, albeit similar, offenses." <u>Bryan v. State</u>, 935 P.2d 338, 356 (Okl.Cr.1997). The Court added, "[w]hen other crimes evidence is so prejudicial it denies a defendant his right to be tried only for the offense charged, or where its minimal relevancy suggests the possibility the evidence is being offered to show a defendant is acting in conformity with his true

character, the evidence should be suppressed." <u>Bryan</u>, 935 P.2d at 356.

The evidence presented by the State was inadmissible under <u>Burks</u> for all the reasons discussed above. In fact, this evidence had even less probative value, and if anything, had a greater prejudicial effect. The evidence concerning the dice, Appellant using or selling marijuana, possession of a firearm during the commission of a felony, and Appellant's alleged gang affiliation had no visible connection with the crime charged.

This evidence was not necessary to support the State's burden of proof, was overly prejudicial, and was cumulative. Furthermore, no limiting instruction was given. (O.R. 188-225)

This is clearly evidence of other crimes or bad acts which does not fit a delineated exception. See Okl. Stat. tit. 12, § 2404(B). That was error and Appellant was prejudiced, as is evidenced by his conviction for murder in the first degree.

This extremely prejudicial information should not have been admitted, and was verdict determinative. Having failed to meet the <u>Burks</u> requirements for an other crimes evidence exception, not satisfying the requirements of *res gestae*, and being more prejudicial than probative, the objectionable evidence stands as no more than a "subterfuge" for showing Mr. Dawkins to be a person deserving of punishment, as explicitly forbidden by <u>Burks</u>.

**PROPOSITION V**

**THE CUMULATIVE EFFECT OF ALL THE ERRORS DEPRIVED MR. DAWKINS OF A FAIR TRIAL.**

A cumulative error analysis aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless. Rivera, 900 F.2d at 1470; see also Darks v. Mullins, 327 F.3d 1001, 1017-18 (10th Cir. 2003).

When a review of the entire trial record reveals numerous irregularities that tend to prejudice the rights of the accused, and where an accumulation of those irregularities deny the accused a fundamentally fair trial, the case will be reversed, even though one of the errors standing alone would not justify reversal. Skelly v. State, 880 P.2d 401, 407 (Okl.Cr.1994). See also U.S. Const. amend. XIV; Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); Darden v. Wainwright, 477 U.S. 168, 180, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); Davis v. Zant, 36 F.3d 1538, 1551 (11th Cir. 1994); United States v. Rivera, 900 F.2d 1462, 1469-1470 (10th Cir. 1990); Okla. Const. art. II, § 7; McCarty v. State, 765 P.2d 1215, 1221-1222 (Okl.Cr.1988).

If any of the errors combined are constitutional in nature, the State must prove beyond a reasonable doubt that such errors could not have contributed to the verdict rendered. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710 (1967); Rivera, 900 F.2d at 1470 n.6. Cumulatively, the errors demonstrated in the instant case denied Appellant a fair trial.

The Court has found such error to be plain error.

> Plain error is that error which goes to the foundation of the case, or which takes from a defendant a right essential to his defense . . . . As the right to a fair trial flows from the Due Process Clause of the state and federal constitutions, it forms the very foundation on which the criminal trial must be based. Error which impinges on the fundamental fairness of trial is plain error.

Cleary v. State, 942 P.2d 736, 752-53 (Okl.Cr.1997) (citations omitted). See also United States v. Moore, 375 F.3d 259 (3rd Cir. 2004); Johnson v. United States, 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997); United States v. Olano, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); West v. State, 764 P.2d 528 (Okl.Cr.1988); Cobbs v. State, 629 P.2d 368 (Okl.Cr.1981); Reeves v. State, 601 P.2d 113 (Okl.Cr.1979). Mr. Dawkins was denied a fair trial by multiple errors and his conviction should be reversed.

## CONCLUSION

Based upon the above and foregoing argument and authorities, Appellant respectfully requests that his conviction and sentence in this case be reversed, or, in the alternative, that the Court modify Appellant's sentence.

Respectfully submitted,

ROBERT A. RAVITZ
Public Defender of Oklahoma County

By: _Kim Chandler Baze_

**KIM CHANDLER BAZE** (OBA # 16444)
Assistant Public Defender
320 Robert S. Kerr Avenue, Suite 611
Oklahoma City, Oklahoma 73102
(405) 713-1550

**ATTORNEY FOR JOSHUA BRENT DAWKINS**

## CERTIFICATE OF SERVICE

This is to certify that on the date of filing of this instrument, a true and correct copy of the same was delivered to the Clerk of the Court of Criminal Appeals with instructions to deliver said copy to the Office of the Attorney General of the State of Oklahoma.

_Kim Chandler Baze_
KIM CHANDLER BAZE